## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **VERNUS MILES,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:24-cv-149-ECM-SMD** |
| | ) | |
| **JOHN Q. HAMM,** *et al.***,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff Vernus Miles, a former Correctional Lieutenant at Limestone Correctional Facility and a twenty-one-year veteran of the Alabama Department of Corrections, files his First Amended Complaint against John Q. Hamm, Commissioner of the Alabama Department of Corrections and Chadwick Crabtree, Warden III of Limestone Correctional Facility, for violating his rights under the First Amendment to the Constitution of the United States.

## INTRODUCTION

1.      In August 2022, Plaintiff Vernus Miles, a twenty-one-year veteran of the Alabama Department of Corrections ("Department"), worked at Limestone Correctional Facility in northern Alabama as a Correctional Lieutenant on the night shift. As Correctional Lieutenant on the night shift, Plaintiff was the highest-ranking security officer at Limestone during his shift, and he was therefore in charge of running the entire facility.

2.      At that time, Limestone was a Level V facility—the highest security level an Alabama prison can have. Level V facilities are designed to house close custody inmates, inmates

sentenced to life without parole, and medium custody inmates that require more security than others.

3.     Not only did Limestone house some of the most dangerous of Alabama's offenders, but it was operating at 138% capacity: it had a population of 2246 inmates in a facility designed to house 1628 inmates.

4.     In August 2022 and for years before, Limestone—and the Department as a whole— had been dangerously understaffed. The Department's staffing problems had been the subject of numerous legislative hearings, lawsuits, and news reports. The Department had been under a court order for years to increase its staffing levels.

5.     According to the Department, for the quarter ending on September 30, 2022, Limestone was operating with only 39.8% of the correctional officers required to run the facility: 324 full-time officers were required to run the facility, but Limestone had only 111.5 full-time officers.

6.     Limestone was also a dangerous facility. In the month of August 2022, the Department reported thirty-two total assaults at Limestone—more assaults than any other facility within the Department and nearly three times as many assaults as any other Level V facility.

7.     Against this backdrop, Plaintiff was trying to safely oversee Limestone's operations on the night shift. But he was being constantly stymied by Limestone's overcrowding, understaffing, and violence, as well as the administration's lack of support for the on-the-floor correctional staff.

8.     Meanwhile, WAAY TV Channel 31, the Huntsville local news, was frequently reporting about issues within Limestone. Concerned about the safety of the community around Limestone, the officers he worked with, and the inmates he supervised, Plaintiff spoke to WAAY TV Channel 31. He spoke about his experiences as a correctional lieutenant in the facility, about

his fears that the lack of adequate staffing could lead to something disastrous, and about his desire that the public know what was happening inside Limestone so they could protect themselves. He spoke anonymously and was only identified as a Department employee; his name and rank were not included and his voice was disguised.

9.      Because he spoke to the media, Plaintiff, who had received only two written disciplinary actions in his twenty-one-year career with the Department, was fired. In doing so, the Department violated Plaintiff's First Amendment rights and sent an intentional and unconstitutional warning to all its employees: your job is at risk if you tell the public anything that is happening inside the Department.

## JURISDICTION AND VENUE

10.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights under the First Amendment to the Constitution of the United States.

11.     This Court has subject matter jurisdiction over Plaintiff's claim under 28 U.S.C. §§ 1331 and 1343(a).

12.     Venue is proper in this district under 28 U.S.C. § 1391(b) because at least one defendant resides in this district and all defendants are residents of the State of Alabama.

## PARTIES

13.     Plaintiff Venus Miles is fifty-two years old and is a citizen of Alabama. Plaintiff resides in Limestone County.

14.     At the time of the actions that form the basis of this Complaint, Plaintiff held the position of Correctional Lieutenant at Limestone Correctional Facility and had been an employee of the Department for more than twenty-one years.

15.     Defendant John Q. Hamm is the Commissioner of the Alabama Department of Corrections, the state agency that administers the prison system in Alabama. He has held that position since January 1, 2022. As Commissioner, Defendant Hamm is a final policymaker for the Department and is the final authority in all Department personnel decisions, including the decision to terminate Plaintiff's employment in violation of his First Amendment rights that forms the basis of this Complaint. Defendant Hamm is sued in his individual and official capacities and can be served with process at 301 South Ripley Street, Montgomery, Alabama, 36104.

16.     Upon information and belief, Defendant Chadwick Crabtree currently holds the position of Warden III of Limestone and has held that position since late 2023. At the time of the actions that form the basis of this Complaint, Defendant Crabtree was Warden II of Limestone and was the Interim Head Warden at that facility. As Interim Head Warden, Defendant Crabtree was responsible for initiating and advocating for personnel decisions at Limestone, including the decision to terminate Plaintiff's employment in violation of his First Amendment rights that forms the basis of this Complaint. Defendant Crabtree is sued in his individual capacity and can be served with process at 301 South Ripley Street, Montgomery, Alabama, 36104.

## FACTUAL ALLEGATIONS

17.     The Department has been the subject of public and legal scrutiny in Alabama for years. Much of that scrutiny has been related to understaffing and overcrowding throughout Alabama's prisons.

18.     In 2014, a class action complaint was filed against the Department alleging that its understaffing and overcrowding, among other things, resulted in constitutionally inadequate medical, mental-health, and dental treatment for all Alabama prisoners. *See Braggs v. Dunn*. Civil Action No. 2:14cv601 (M.D. Ala.).

19.    In October 2016, the United States Department of Justice opened a statewide investigation under the Civil Rights of Institutionalized Persons Act into the conditions of Alabama's prisons for men, focusing on whether prisoners are adequately protected from physical harm and sexual abuse by other prisoners; whether prisoners are adequately protected from excessive force and sexual abuse by correctional officers; and whether the prisons provide sanitary, secure, and safe living conditions.

20.    In April 2019, the DOJ published the report of its investigation.[1] The report concluded that reasonable cause existed to believe that "Alabama routinely violates the constitutional rights of prisoners housed in the Alabama's prisons by failing to protect them from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions," and that the violations "are exacerbated by serious deficiencies in staffing and supervision and overcrowding."[2]

21.    The report stated that "[s]taffing in Alabama's prisons is at a crisis level."[3] Citing the Department's own published figures, it stated:

    a.    For fiscal year 2017, the Department reported "critical levels of authorized staffing shortages."[4]

---

[1] *See* Notice Regarding Investigation of Alabama's State Prisons for Men, *available at* https://www.justice.gov/d9/press-releases/attachments/2019/04/03/notice_letter_and_report_aldoc.pdf.

[2] *Id.* at 1.

[3] *Id.* at 9.

[4] *Id.*

b.     In February 2019, the Department publicly acknowledged that it needed to hire more than 2000 correctional officers and 125 correctional supervisors to adequately staff its men's prisons.[5]

22.     The report also discussed in detail staffing shortages at each of the Department's prisons, pulling from the Department's own, publicly available figures.[6]

23.     In the report, a "former ADOC warden" was quoted as stating that "the convicts are in extreme danger and the correctional officers working there are in extreme danger" because of the understaffing.[7]

24.     The then-current warden of Holman Correctional Facility was quoted as stating that "on any given day," she has "probably 11" security staff, both officers and supervisors, per shift for the entire complex—a prison population of approximately 800.[8]

25.     The then-current warden at Bibb was quoted as stating that he "currently has only 66 assigned security staff, both officers and supervisors, covering approximately 1,800 prisoners over four shifts."[9]

26.     The Department itself frequently publicizes information about its serious understaffing.

---

[5] *Id.*
[6] *See id.* at 9–10.

[7] *Id.* at 10.

[8] *Id.*

[9] *Id.*

27.    The Department's Annual Report for Fiscal Year 2018 included a full-page discussion of the Department's "plans to optimize [its] critical shortage of correctional officers through recruiting initiatives and repurposing facilities."[10]

28.    In the Department's Annual Report for Fiscal Year 2019, Alabama Governor Kay Ivey acknowledged that Alabama's corrections systems were "a problem," and that the problem was "exacerbated by a crowded inmate population[ and] correctional . . . staffing challenges."[11] She said that the Department "must increase [its] correctional staffing levels" and "reduce the turnover rate of correctional staffing."[12]

29.    Since January 2019, pursuant to a court order in ongoing litigation, the Department has publicly filed information about its correctional staffing every three months. *See Braggs*, No. 2:14cv601, ECF No. 1657. The information the Department files includes facility-specific information, such as the total number of assigned (needed) correctional staff and the total number of actual correctional staff, with the actual staffing numbers broken down by position—Correctional Cubical Operators (CCOs), Basic Correctional Officers (BCOs), Correctional Officers (COs), and Senior Correctional Officers (Sr. COs). *See id.*, ECF No. 2228 (order directing that the facility-specific information be publicly filed five months after the last day of the quarter the information reports about); *see also, e.g., id.*, ECF Nos. 4141-1 (report for the quarter ending September 30, 2023), 4094-1 (report for the quarter ending June 30, 2023).

---

[10] ADOC Annual Report Fiscal Year 2018 at 11, *available at* https://doc.alabama.gov/StatReports.

[11] ADOC Annual Report Fiscal Year 2019 at 10, *available at* https://doc.alabama.gov/StatReports.

[12] *Id.*

30.     Since August 2021, when Ala. Code § 14-1-24 went into effect, the Department has published quarterly reports that contain statistical data about correctional officer staffing levels within its prisons.[13]

31.     Department officials, including Defendant Hamm, regularly speak publicly about the Department's staffing shortages. In September 2023, Defendant Hamm told members of Alabama's Joint Legislative Prison Oversight Committee that only 1700 of the Department's budgeted 2420 security positions were filled. In August 2022, Defendant Hamm told Alabama legislators that only 1879 of those security positions were filled.

32.     Other people associated with the Department have also spoken publicly about the Department's staffing shortages. In November 2022, Stacy George, a former correctional officer for the Department was widely reported discussing staffing issues at Limestone. George was identified as stating that "it is not unusual to have as few as about nine officers on duty at Limestone, not counting supervisors," even though "that number needs to be about 35."[14]

33.     On or about August 11, 2022, WAAY TV Channel 31 News, local news for the Huntsville, Alabama area, aired a story about understaffing and associated security risks at Limestone on its 4:00 p.m. evening news.

---

[13] *See* Ala. Code § 14-1-24(a)(2) (requiring the Department to submit to the Joint Legislative Prison Oversight Committee quarterly reports that "allow the Legislature to assess the general status of correctional officer staffing levels, including new hires and retention between reporting periods"); *see also* https://doc.alabama.gov/StatReports (making the statistical reports publicly available).

[14]     https://www.al.com/news/2022/11/former-correctional-officer-says-alabama-prison-staffing-shortage-has-reached-critical-point.html. WAAY TV Channel 31 News also reported on George's comments in late October. *See* https://www.waaytv.com/video/crisis-at-limestone-correctional-facility/video_6a3ccae9-5e23-5bdc-94a3-27267e1c417f.html.

34.    As part of the story, reporter Matt Kroschel interviewed "two current ADOC employees" who Kroschel said were concerned about a "meltdown" at Limestone.[15]

35.    An audio recording of one of those employees was played as part of the story, with the employee's voice disguised. The employee made the following statements:

> Honestly, I don't think they want anybody to know about it. There's [sic] not enough officers in this camp on any given day to monitor the camp properly. And eventually somebody is going to take that chance, just like they do at every other prison, and they're going to try to get out. More than likely, they will succeed.
>
> . . . .
>
> I'm afraid for the officers' lives, I'm afraid for the contract personnels' lives, and I'm afraid for your public. It's just a matter of time before somebody gets out and somebody gets hurt.
>
> . . . .
>
> How we're even operating is beyond me for now. We are at the inmates' mercy. Honestly. If they decide they want us out of the way, there's nothing we can do to stop them. When you talk about twelve to eighteen officers on any given night, being there to work or, during the day, twenty to twenty-five maybe, there's not enough of us to cover 2300 inmates.
>
> . . . .
>
> It is the very worst I've ever seen it.

36.    The employees' names and ranks were not included in the story because of their fear of retaliation by the Department.

37.    The story also played screen shots of what it described as "internal ADOC documents on staffing at Limestone Correctional," and stated that WAAY TV 31 had "verified those documents [we]re accurate." The documents were titled "Limestone Correctional Facility

---

[15]    *See*        https://www.waaytv.com/video/employees-expose-security-crisis-at-limestone-correctional-facility/video_c5dbe48f-aa0c-55bd-ab43-ef20bb184f19.html.

Standard Operating Procedure A-4 Staffing Requirements," and were described as showing "what's supposed to be a staff of more than 700 members is currently at 165, leaving the facility short more than 550 personnel."

38.   The story reported that Limestone's staffing numbers require at least 32 staff members on any given shift, but fewer than 18 officers actually work each shift, leaving only one guard for every 200 inmates.

39.   WAAY TV 31 ran a similar story on its 6:00 p.m. broadcast the same day, recapping the employees' stated fears and discussing the internal ADOC documents about staffing at Limestone.

40.   In that 6:00 p.m. broadcast, WAAY TV 31 also reported that, even when 18 officers work each shift, "that number drops to 12 or fewer often," when officers are out sick and others have to take inmates to the hospital.[16]

41.   The next day, August 12, 2022, WAAY 31 published a written article titled "'We are at the inmate's [sic] mercy': Limestone Correctional Facility employees detail security crises."[17] Ex. 1.

42.   Written by Matt Kroschel, the August 12, 2022 article contained much of the same information as the TV reports the night before. *See id.* It also included the additional detail that "mandatory patrols around this prison's exterior fence call for two staff members in trucks driving the perimeter 24 hours a day, but sources said ADOC is struggling to staff just one truck." *Id.* And it quoted an "employee" as stating "Limestone is in a dire need of assistance at this point, and no

---

[16]   *See*  https://www.waaytv.com/video/adoc-employees-on-security-concerns/video_84807d0d-7a2e-5a28-b549-df0025345453.html.

[17]   *See*  https://www.waaytv.com/news/we-are-at-the-inmates-mercy-limestone-correctional-facility-employees-detail-security-crises/article_f3a20760-19c2-11ed-811c-a327c2433353.html. *See also* Exhibit 1.

one is willing to give us assistance in the higher levels of our department. It is almost like they want us to get hurt or fail. It is just getting scary." *Id.*

43.     Upon information and belief, WAAY TV 31 has never publicly identified the names or ranks of the employees who provided the information that was the subject of the reporting described above.

44.     On August 18, 2022, Defendant Crabtree called Plaintiff into his office for an interview about the media reports.

45.     Former Warden DeWayne Estes was also present on behalf of the Office of the Inspector General.

46.     During the interview, which lasted approximately an hour, Defendant Crabtree and Warden Estes asked Plaintiff if he had any information about the WAAY News 31 reports. They were especially interested in whether Plaintiff had provided the document about Limestone's staffing requirements to WAAY TV News.

47.     Plaintiff initially denied any knowledge. Defendant Crabtree and Warden Estes told Plaintiff they had electronically un-disguised the voice of the person speaking to the media, and that they knew it was Plaintiff's voice. Plaintiff then admitted that he had spoken with the reporter.

48.     Plaintiff continued to deny that he shared any documents with WAAY News 31.

49.     Plaintiff told Defendant Crabtree and Warden Estes that all the supervisors below him had access to his computer, explaining that he gave them access because they could not get Word or Excel on the shift commander computer. Plaintiff explained that the staff had submitted numerous requests to have IT address the problem, but it had never been fixed. Therefore, Plaintiff allowed the supervisors on his shift to access to his computer so they could complete their required job duties.

50.     Plaintiff continued to deny that he shared any documents with WAAY News 31 and to explain that he did not know who shared the documents and did not know how WAAY News 31 had gotten the documents.

51.     During the interview, Plaintiff allowed Defendant Crabtree and Warden Estes to search through his department email to look for evidence that he had shared the documents. They did not find any evidence that he had done so.

52.     During the interview, Plaintiff also informed Defendant Crabtree and Warden Estes that he had a thumb-drive issued by the Department on which he maintained files related to his employment. Plaintiff allowed Defendant Crabtree and Warden Estes to search his thumb-drive for evidence that he had shared the documents. They did not find any evidence that he had done so.

53.     The August 18, 2022 interview ended with Plaintiff reiterating that he had talked to a reporter, but he did not give WAAY News 31 any documents.

54.     The next day, August 19, 2022, Plaintiff was called into Defendant Crabtree's office. During that meeting, Defendant Crabtree slid a copy of Department Administrative Regulation 5[18] (governing employee contact with media) across his desk to Plaintiff and told Plaintiff that he was on administrative leave pending further review. Defendant Crabtree cited no other reason for placing Plaintiff on administrative leave.

55.     Plaintiff heard nothing more from Defendant Crabtree until September 29, 2022, when Plaintiff was directed to meet with Defendant Crabtree at Limestone the next day.

---

[18] ADOC Administrative Regulation 5 is attached as Exhibit 2.

56.     When Plaintiff went into Defendant Crabtree's office, Defendant Crabtree handed him a letter dated August 25, 2022, told Plaintiff that he was recommending him for dismissal, and asked Plaintiff to sign the letter.

57.     On October 11, 2022, Defendant Crabtree held a pre-dismissal hearing with Plaintiff. Defendant Crabtree discussed the charges he alleged against Plaintiff, and Plaintiff responded to the charges.

58.     Defendant Hamm approved Defendant Crabtree's recommendation to dismiss Plaintiff. Plaintiff was sent a letter dated November 7, 2022, and signed by Defendant Hamm notifying Plaintiff of his termination and the basis for it. Exhibit 3.

59.     The letter stated that Plaintiff had violated the following standards under ADOC Administrative Regulation 208:

    1.  Employees shall render full, efficient, and industrious service. (Section V, Paragraph A2)
    2.  Employees shall exercise courtesy and tact. (Section V, Paragraph A4)
    3.  Employees shall protect and conserve funds, property, and equipment and material (Section V, Paragraph A6)
    4.  Employees shall observe all laws, rules and regulations. (Section V, Paragraph A7)
    5.  Employees shall uphold, with integrity, the public's trust involved in their position (Section V, Paragraph A8)
    6.  Employees shall not take any article or property whatsoever from any institution or from state property not specifically authorized by regulation. (Section V, Paragraph C9)
    7.  Employees shall not use Provide [sic] any information relative to the ADOC to any source including newspapers, radio, television, or any other source or agency except as directed by ADOC regulations. (Refer to AR 005, Public and Community Regulations) (Section V, Paragraph C19)

*Id.* at 1.

60.     The letter also listed the following "infraction(s)," and stated that the infractions had been considered in determining the level of corrective action to apply:

    1.  Non-compliance with policies, procedures, and regulations. (Administrative Regulation 208, Annex H, Number 2)

2.      Unauthorized use of telephone, bulletin boards, or other state property. (Administrative Regulation 208, Annex H, Number 5)

3.      Failure to follow supervisor's instructions; non-compliance with policies and procedures. (Administrative Regulation 208, Annex H, Number 11)

4.      Disagreeable behavior, including lack of cooperation and insubordination. (Administrative Regulation 208, Annex H, Number 13)

5.      Serious violations of rules, policies, procedures, regulations, laws, or reasonable conduct expectations. (Administrative Regulation 208, Annex H, Number 13)

6.      Unauthorized use of computer systems. (Administrative Regulation 208, Annex H, Number 23)

7.      Abuse or misuse of authority, including but not limited to departmental property and/or ADOC identification cards/items. (Administrative Regulation 208, Annex H, Number 25)

8.      Conduct that is disgraceful, on or off the job that does adversely affect an employee's effectiveness on the job. (Administrative Regulation 208, Annex H, Number 33)

*Id.* at 2.

61.    The letter also stated the following:

On August 15, 2022, WAAY TV Channel 31 News aired a story about staffing levels, security issues and practices at Limestone Correctional Facility. The person being interviewed had their voice disguised. On August 18, 2022, during an interview with Warden Streeter and myself [sic], you did admit to speaking to a reporter from WAAY TV Channel 13 news about the staffing levels and security posts/practices at Limestone Correction [sic] Facility. You further stated you were mad and had been venting/complaining about the Facility and Departmental Leadership to your subordinate employees and other Supervisors. When questioned about facility documents that were shared with the reporter you stated that any of your employees could have gotten the documents from your ADOC email account because you allowed them to use your credentials. Your action compromised your ability to lead.

*Id.* at 2–3.

62.    Plaintiff's employment with the Department was terminated effective November 10, 2022.

63.    Plaintiff appealed the termination of his employment to the State Personnel Board pursuant to Alabama Code § 36-26-27(a). *See* Ex. 4.

14

64.    In his appeal letter, Plaintiff described several correctional officer staffing issues on his shift in the weeks before he spoke to the media. *See id.* at 1–2. He stated that he "ultimately decided to give the interview as a cry for help. Not for me, but for my fellow correctional officers and staff at Limestone Correctional Facility. . . . The problems have been simmering for years and now we do not have the manpower to ensure a safe environment." *Id.* at 2. He stated that his "main concern has been and will always be for the safety, health and well-being of the great men and women at Limestone Correctional Facility." *Id.* at 3.

65.    On February 3, 2023, an Administrative Law Judge (ALJ) conducted a hearing on Plaintiff's appeal. At the hearing, the ALJ heard testimony from Plaintiff and Defendant Crabtree. The Department submitted eighteen exhibits, and the ALJ also considered Plaintiff's personnel file.

66.    On February 14, 2023, the ALJ issued a Recommended Order to the State Personnel Board recommending that Plaintiff's termination be upheld. *See* Ex. 5.

67.    The ALJ described the issue before it as: "Did [A]DOC produce proof, by a preponderance of the evidence, to sustain Miles' dismissal based upon violations of State Personnel Board Rules and DOC rules, regulations, policies and procedures?" *Id.* at 13.

68.    The entirety of the ALJ's analysis of Plaintiff's termination was as follows:

> The undersigned has observed and carefully considered the witnesses' demeanor, testimony, and all the documentary evidence in this case and finds that the preponderance of the evidence establishes Miles violated State Personnel Board rules and DOC's rules, regulations, policies and procedures and was appropriately discharged for the good of the service.
>
> [A]DOC followed its own rules and procedures and those of the State Personnel Board and established to the satisfaction of the undersigned that the admissions by Miles and the preponderance of the available direct, circumstantial and testimonial evidence supports Miles' dismissal. Miles' termination should be upheld.

*Id.* at 15. The ALJ did not consider, decide, or even mention whether terminating Plaintiff's employment for speaking to the media violated his First Amendment rights.

69.    On March 15, 2023, the Personnel Board issued an order adopting the ALJ's findings of fact and conclusions of law and concluding that the decision to dismiss Plaintiff was "supported by the evidence and that the termination [wa]s warranted." Ex. 6 at 2–3.

70.    Plaintiff did not appeal the Personnel Board's decision pursuant to Ala. Code § 41-22-20.

71.    At the time his employment was wrongfully terminated, Plaintiff was the A-night Lieutenant and had held that position for approximately six years. As the A-night Lieutenant, Plaintiff was the highest-ranking security officer on duty at Limestone during his shift, and he was therefore in charge of running the facility.

72.    Plaintiff's job responsibilities included completing reports; counseling subordinate employees; demonstrating work methods and procedures; evaluating performance; exchanging information; inspecting areas of responsibility; monitoring the count of inmates; reviewing all reports; supervising subordinates; and counseling inmates.

73.    None of Plaintiff's job responsibilities included or related to communicating with the public or the media about the Department's operations.

74.    Before his employment was wrongfully terminated, Plaintiff had an exemplary employment history with the Department. He graduated from correctional officer academy in 2001 and received an overall score of "Meets Standards" in his performance appraisal for that year.

75.    In 2002 and 2003, Plaintiff received overall scores of "Exceeds Standards" on his performance appraisals.

76.    From 2004 to 2022, Plaintiff received overall scores of "Consistently Exceeds Standards" (the highest category possible) every year except 2017, when he received an overall score of "Exceeds Standards."

77.    Throughout Plaintiff's career with the Department, he received a total of twenty-three performance appraisals. On nine of those, Plaintiff received the highest possible score of forty points (2021, 2020, 2019, 2015, 2014, 2013, 2009, 2008, and 2007). On two of those, Plaintiff received a score of thirty-nine (2011 and 2021). On five of those, Plaintiff received a score of thirty-eight (2022, 2009, 2006, 2005, 2004).

78.    In his June 1, 2022 performance appraisal, the last appraisal conducted before he was wrongfully terminated, Plaintiff received a score of thirty-eight, corresponding to an overall category of "Consistently Exceeds Standards."

79.    In Plaintiff's twenty-one-year career with the Department, he received only two written disciplinary actions: a warning in 2009 for "non-compliance with policies, procedures, and regulations," and a written reprimand for "inattention to the job" in 2016.

## CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 – RETALIATION
### Violation of the First Amendment
### *Plaintiff against Defendants in their individual capacities*

80.    Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth in this Count.

81.    At all times relevant to the allegations in this Complaint, Defendants acted under color of state law.

82.    Plaintiff's communication with WAAY News 31 was speech which is protected under the First Amendment to the U.S. Constitution.

83. Plaintiff spoke with WAAY News 31 as a citizen and not in the scope of his duties with the Department.

84. Plaintiff's speech to WAAY News 31 addressed a matter of great public concern, specifically the safety and security of Limestone Correctional Facility, a major correctional facility in the Huntsville, Alabama area.

85. Plaintiff's and the public's interest in the information Plaintiff shared with WAAY TV 31 outweighs any interest the Department had in prohibiting Plaintiff from speaking.

86. Plaintiff's employment was terminated solely because Plaintiff spoke to WAAY TV 31.

87. At the time of Defendants' actions, it was clearly established that terminating Plaintiff's employment for speaking with WAAY TV 31 violated Plaintiff's rights under the First Amendment to the U.S. Constitution.

## COUNT I: 42 U.S.C. § 1983 – RETALIATION
### Violation of the First Amendment – Supervisory Liability
### *Plaintiff against Defendant Hamm in his individual capacity*

88. Plaintiff repeats and re-alleges Paragraphs 1–79 as if fully set forth in this Count.

89. At all times relevant to the allegations in this Complaint, Defendants acted under color of state law.

90. Defendant Hamm is a final policymaker for the Department.

91. Plaintiff's communication with WAAY News 31 was speech which is protected under the First Amendment to the U.S. Constitution.

92. Plaintiff spoke with WAAY News 31 as a citizen and not in the scope of his duties with the Department.

93.     Plaintiff's speech to WAAY News 31 addressed a matter of great public concern, specifically the safety and security of Limestone Correctional Facility, a major correctional facility in the Huntsville, Alabama area.

94.     Plaintiff's and the public's interest in the information Plaintiff shared with WAAY TV 31 outweighs any interest the Department had in prohibiting Plaintiff from speaking.

95.     Plaintiff's employment was terminated solely because Plaintiff spoke to WAAY TV 31.

96.     The Department has a written, official policy of preventing employees from speaking with any members of the media without prior approval. This policy is written in ADOC Administrative Regulation 5.

97.     Plaintiff's employment was terminated pursuant to ADOC Administrative Regulation 5.

98.     Applying ADOC Administrative Regulation 5 to prohibit Plaintiff from speaking with WAAY TV 31 in the ways described in Paragraphs 1–79 of this Complaint violated Plaintiff's rights under the First Amendment to the U.S. Constitution.

99.     At the time of Defendants' actions, it was clearly established that terminating Plaintiff's employment for speaking with WAAY TV 31 violated Plaintiff's rights under the First Amendment to the U.S. Constitution.

**COUNT III: 42 U.S.C. § 1983 – RETALIATION**
**Violation of the First Amendment**
***Plaintiff against Defendant Hamm in his official capacity***

100.    Plaintiff repeats and re-alleges Paragraphs 1–79 as if fully set forth in this Count.

101.    At all times relevant to the allegations in this Complaint, Defendants acted under color of state law.

102.    Defendant Hamm is a final policymaker for the Department with respect to personnel decisions.

103.    Plaintiff's communication with WAAY News 31 was speech which is protected under the First Amendment to the U.S. Constitution.

104.    Plaintiff spoke with WAAY News 31 as a citizen and not in the scope of his duties with the Department.

105.    Plaintiff's speech to WAAY News 31 addressed a matter of great public concern, specifically the safety and security of Limestone Correctional Facility, a major correctional facility in the Huntsville, Alabama area.

106.    Plaintiff's and the public's interest in the information Plaintiff shared with WAAY TV 31 outweighs any interest the Department had in prohibiting Plaintiff from speaking.

107.    Plaintiff's employment was terminated solely because Plaintiff spoke to WAAY TV 31.

108.    The Department has a written, official policy of preventing employees from speaking with any members of the media without prior approval. This policy is written in ADOC Administrative Regulation 5.

109.    Plaintiff's employment was terminated pursuant to ADOC Administrative Regulation 5.

110.    Applying ADOC Administrative Regulation 5 to prohibit Plaintiff from speaking with WAAY TV 31 in the ways described in Paragraphs 1–79 of this Complaint violated Plaintiff's rights under the First Amendment to the U.S. Constitution.

111.    Because Plaintiff's employment was terminated in violation of the First Amendment, he is entitled to the equitable remedy of reinstatement. *See Cross v. Ala. State Dep't of Mental Health & Retardation*, 49 F.3d 1490, 1503 (11th Cir. 1995).

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that this Court grant the following relief:

1.      Issue an Order declaring that Defendants violated Plaintiff's rights under the First Amendment to the U.S. Constitution;

2.      Order that Plaintiff be reinstated to his former position and placed at North Alabama Community Work Center.

3.      Award Plaintiff compensatory damages for the wrongful termination of his employment, including:

        a.  Back wages;

        b.  Lost benefits;

        c.  Lost retirement income;

        d.  Pre- and post-judgment interest;

4.      Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

5.      Award Plaintiff punitive damages.

6.      Award Plaintiff such other and further relief as this Court may deem appropriate and just.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted this 12th day of August 2024.

*/s/ Joseph Mitchell McGuire*
Joseph Mitchell McGuire
(ASB-8317-S69M)

Susanne Emily Cordner
(ASB-4687-C61N)
*McGuire & Associates, LLC*
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000
scordner@mandabusinesslaw.com
jmcguire@mandabusinesslaw.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will electronically send notification of such filing to all counsel of record.

*/s/ Joseph Mitchell McGuire*
*Attorney for Plaintiff*