IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| VERNUS MILES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:24-cv-149-ECM |
| | ) | [WO] |
| JOHN Q. HAMM, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

**I. INTRODUCTION**

On March 6, 2024, Plaintiff Vernus Miles ("Miles") sued John Q. Hamm ("Commissioner Hamm"), Commissioner of the Alabama Department of Corrections ("ADOC"), and Chadwick Crabtree ("Warden Crabtree"), Warden of Limestone Correctional Facility in Harvest, Alabama ("Limestone") (collectively "Defendants"). Miles, a former Limestone Correctional Lieutenant, brings this suit against Commissioner Hamm in both his individual and official capacities and against Warden Crabtree in his individual capacity. Miles alleges that he was terminated in retaliation for speaking with the media about staffing shortages at Limestone, violating his First Amendment rights. He brings three separate claims and seeks compensatory damages, punitive damages, reinstatement to a position within ADOC, and declaratory relief.

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a). Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III. LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (alteration in original) (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555–56. This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.*

## IV. FACTS[1]

Miles worked for ADOC for twenty-one years before he was dismissed from his position in August 2022. (Doc. 25 at 1, para. 1).[2] At the time of his dismissal, Miles worked as a correctional lieutenant on the night shift at Limestone.[3] (*Id.* at 1, para. 1). During his shifts, Miles "was the highest-ranking security officer" and "therefore in charge of running the entire facility."[4] (*Id.* at 1, para. 1).

The staffing problems in ADOC are well-documented and have been the subject of litigation, legislative hearings, DOJ investigation, and news reports. (*Id.* at 4–8, paras. 17–32). On August 11, 2022, WAAY TV Channel 31 ("WAAY TV"), a local news channel in Huntsville, Alabama, played a story about understaffing and associated security risks at Limestone on its 4:00 p.m. and 6:00 p.m. evening news, relying on information received from two ADOC employees. (*Id.* at 8–9, paras. 33–34). The broadcast included "screen shots of what it described as internal ADOC documents on staffing at Limestone." (*Id.* at 9, para. 37). During the story, WAAY TV played an audio recording of one of the "current

---

[1] The recitation of the facts is based on Miles' amended complaint and the attached exhibits. (*See* doc. 25). At the motion-to-dismiss stage, the Court accepts as true the "factual matter" set forth in the complaint. *Ashcroft*, 556 U.S. at 678.

[2] References to page numbers are to those generated by the Court's CM/ECF electronic filing system.

[3] Limestone is a Level V security facility, the highest level in Alabama, and is "designed to house close custody inmates, inmates sentenced to life without parole, and medium custody inmates that require more security than others." (Doc. 25 at 1–2, para. 2).

[4] Miles describes his former job duties as "completing reports; counseling subordinate employees; demonstrating work methods and procedures; evaluating performance; exchanging information; inspecting areas of responsibility; monitoring the count of inmates; reviewing all reports; supervising subordinates; and counseling inmates." (Doc. 25 at 16, para. 72). Communicating with the media, however, was not part of Miles' assigned role. (*Id.* para. 73).

ADOC employees" but disguised the employee's voice and did not publicly identify the employee's name or rank. (*Id.* at 9, paras. 34–36).  WAAY TV memorialized the report in a written article on its website the next day. (*Id.* at 10, paras. 39–40; *see also* doc. 25-1).

Miles was one of the two ADOC employees who spoke with WAAY TV about Limestone's staffing shortages.  Among other things, Miles stated, "When you talk about twelve to eighteen officers on any given night, being there to work or, during the day, twenty to twenty-five maybe, there's not enough of us to cover 2300 inmates."[5] (Doc. 25 at 9, para. 35).  Miles indicated he was "afraid" for his staff, contract personnel, and the public because "[i]t's just a matter of time before somebody gets out and somebody gets hurt." (*Id.*).

Additionally, "internal ADOC documents" supported Miles' statements, containing information about assignments which were neglected due to staffing shortages. (*Id.* at 9–10, para. 37).  The 6:00 p.m. broadcast contained further information that twelve or fewer officers could be working during any shift if officers take leave or an inmate needs to be transported to the hospital. (*Id.* at 10, para. 40).  WAAY TV's written report contained more details.  Specifically, it noted that Limestone protocol requires correctional officers to patrol the perimeter of Limestone in two trucks, but with the staffing shortages, ADOC was "struggling to staff just one truck." (*Id.* para. 42).

---

[5] While the complaint does not clearly identify what statements Miles made during his discussions with the reporter, his response to the Defendants' motion to dismiss indicates that, at the very least, his voice is the disguised voice used in the television broadcast. (*See* doc. 30 at 20).

On August 18, 2022, a week after the story aired on WAAY TV, Warden Crabtree[6] summoned Miles to his office to discuss the story and inquire whether Miles knew which ADOC employees spoke to the reporter. (*Id.* paras. 44–46). Warden Crabtree and Estes were especially concerned because an employee released internal ADOC documents to the media. (*Id.* para. 46). Miles initially denied any involvement in the story. (*Id.* para. 47). After Warden Crabtree and Estes revealed that "they had electronically un-disguised the voice" on the report and recognized Miles' voice, Miles admitted that he spoke with the reporter. (*Id.*).

Warden Crabtree and Estes continued to question Miles about the documents, but Miles denied any involvement in their release. (*Id.* at 11–12, paras. 48, 50). Miles revealed that "all the supervisors below him had access to his computer" because they needed access to Microsoft Word and Excel to complete their job duties. (*Id.* at 11, para. 49). The computers assigned to the supervisors did not have these programs. (*Id.*). Miles permitted Warden Crabtree and Estes to search his email inbox for evidence that he shared documents with the press. (*Id.* at 12, para. 51). He also provided a thumb drive issued by ADOC to maintain job-related files for their investigation. (*Id.* para. 52). Neither his email nor thumb drive evidenced that Miles shared documents with WAAY TV. (*Id.* paras. 51–52).

On August 19, 2024, the day following the questioning, Warden Crabtree placed Miles on administrative leave pending further review pursuant to ADOC Administrative Regulation 5, which governs ADOC employees' contact with media. (*Id.* para. 54). On

---

[6] Former Warden DeWayne Estes ("Estes"), who was part of the Office of the Inspector General, accompanied Warden Crabtree during the meeting with Miles. (*Id.* at 11, para. 45).

September 29, 2022, Miles, while on administrative leave, was told to return to Limestone to meet with Warden Crabtree the next day, September 30. (*Id.* para. 55).  Upon his return to Limestone, Warden Crabtree communicated to Miles that he was recommending Miles' dismissal. (*Id.* at 13, para. 56).  Almost two weeks later, on October 11, 2022, Warden Crabtree and Miles had a pre-dismissal hearing and discussed the charges against Miles. (*Id.* para. 57).

Nearly a month later, on November 7, 2022, Commissioner Hamm sent Miles a letter which accepted Warden Crabtree's recommendation and terminated Miles' employment with ADOC. (*Id.* para. 58).  The letter claimed that Miles violated ADOC Administrative Regulation 208 and committed a series of infractions under various ADOC policies. (*See id.* at 13–14, paras. 59–60).  Miles' termination became effective on November 10, 2022. (*Id.* at 14, para. 62).

Miles appealed ADOC's decision to the Alabama State Personnel Board ("Personnel Board"). (*Id.* para. 63).  In his appeal, he was unrepresented by counsel and argued his interview with WAAY TV was "a cry for help" to express concern for "the safety, health and well-being of the great men and women at Limestone." (*Id.* at 15, para. 64).  On February 3, 2023, an Administrative Law Judge ("ALJ") conducted a hearing. (*Id.* para. 65).  He heard testimony from Miles and Warden Crabtree, reviewed eighteen exhibits submitted by ADOC, and examined Miles' personnel file. (*Id.*).  Eleven days later, the ALJ issued a Recommending Order to the Personnel Board. (*Id.* at 15–16, para. 66).  In his recommendation, the ALJ's inquiry focused on whether ADOC produced sufficient evidence (preponderance of the evidence) "to sustain Miles' dismissal based

upon violations of State Personnel Board Rules and [A]DOC rules, regulations, policies and procedures[.]" (*Id.* at 15, para. 67; doc. 25-5 at 13).  The ALJ did not discuss Miles' First Amendment rights. (Doc. 25 at 16, para. 68).  But he did uphold Miles' termination. (*Id.* at 15, para. 66).  The Personnel Board adopted the ALJ's recommendation and reasons, affirming Miles' termination. (*Id.* at 16, para. 69).

Miles now challenges his termination in this Court, arguing that ADOC's decision to terminate him violated his First Amendment rights.  He brings three claims for retaliation in violation of the First Amendment:  (1) against Warden Crabtree and Commissioner Hamm in their individual capacities (Count I); (2) against Commissioner Hamm for supervisory liability in his individual capacity (Count II); and (3) against Commissioner Hamm in his official capacity (Count III). (Doc. 25 at 17–19).  The Defendants filed a motion to dismiss (doc. 27), which has been fully briefed and is ripe for review (*see* docs. 30, 33).

## V.  DISCUSSION

The Defendants seek to dismiss all three of Miles' claims, making three arguments in support of their motion.[7]  First, the Defendants claim that Miles' appeal of his termination in state administrative proceedings precludes him from bringing his suit in this Court.  Second, for claims asserted against the Defendants in their individual capacities, the Defendants contend that qualified immunity protects them from personal liability.

---

[7] The Defendants also argue that Miles fails to state a claim for First Amendment retaliation in Count I. The Court rejects that argument for the reasons set forth herein in Section B.1.

Third, Commissioner Hamm argues that Eleventh Amendment immunity protects him from liability in his official capacity.

## A.    Preclusion

The Defendants argue that Miles is precluded from raising these issues here because the ALJ and Personnel Board previously decided the claims he brings.  Miles disagrees. He argues that the ALJ and Personnel Board only decided whether Miles violated ADOC policies and not whether the Defendants violated his First Amendment rights.  The Defendants claim the administrative process was broader and decided "the merits of [Miles'] dismissal from state service," which included any potential constitutional claims. (Doc. 28 at 14).

As the Eleventh Circuit clarified in *Gjellum v. City of Birmingham*, issue preclusion, rather than claim preclusion, applies to § 1983 claims brought by plaintiffs after a state administrative agency acted in a judicial capacity. 829 F.2d 1056, 1064–65 (11th Cir. 1987).  The parties agree that issue preclusion (and not claim preclusion) governs Miles' claim.  Issue preclusion, also called collateral estoppel, is narrower in scope, only preventing a litigant from raising specific issues previously raised in subsequent litigation. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984).  Conversely, claim preclusion prevents the bringing of claims "that never ha[ve] been litigated, because of a determination that it should have been advanced in an earlier suit." *See id.*  "Under Alabama law, collateral estoppel applies to issues raised in state administrative proceedings" if five elements are met:

> (1) There is identity of the parties or their privities; (2) there is identity of
> issues; (3) the parties had an adequate opportunity to litigate the issues in
> the administrative proceeding; (4) the issues to be estopped were actually
> litigated and determined in the administrative proceeding; and (5) the
> findings on the issues to be estopped were necessary to the administrative
> decision.

*Trimble v. Montgomery Pulmonary Consultants, P.A.*, 587 F. Supp. 3d 1135, 1140–41

(M.D. Ala. 2022)[8] (quoting *Wal-Mart Stores, Inc. v. Smitherman*, 743 So. 2d 442, 445

(Ala. 1999), *overruled on other grounds by Ex parte Rogers*, 68 So. 773 (Ala. 2010)).  "The

burden is on the party asserting collateral estoppel to prove that the issue it is seeking to

bar was determined in the prior adjudication." *Id.* at 1141 (quoting *Lee L. Saad Constr. Co.*

*v. DPF Architects, P.C.*, 851 So. 2d 507, 520 (Ala. 2002)).

The Defendants fail to carry their burden.  Specifically, the Defendants fail to

adequately show the fourth and fifth elements of issue preclusion.  As the ALJ's decision

made clear, the issue before him was whether "[A]DOC produce[d] proof, by a

preponderance of the evidence to sustain Miles' dismissal based upon violations of State

Personnel Board Rules and [A]DOC rules, regulations, policies and procedures[.]"

(Doc. 25-5 at 14).  Neither the ALJ nor the Personnel Board decided whether Miles' First

Amendment rights were violated. (*See* doc. 25-5, 25-6).  In fact, Miles' *pro se* brief did not

raise the issue. (*See* doc. 25-4).  Because the issue was not "actually litigated and

determined" nor "necessary to the administrative decision," issue preclusion does not

apply, and Miles can bring his First Amendment retaliation claims against the Defendants.

---

[8] Here, and elsewhere in this Memorandum Opinion, the Court cites nonbinding authority.  While the Court recognizes that these cases are nonprecedential, the Court finds them persuasive.

*See, e.g.*, *Stewart v. Brinley*, 902 So. 2d 1, 11–13 (Ala. 2004) (holding that claims were not actually litigated when the plaintiff did not raise any allegations relevant to the second case during the first litigation).

## B.    Qualified Immunity

Warden Crabtree and Commissioner Hamm next argue that the claims asserted against them in their individual capacities should be dismissed because of qualified immunity.  For Warden Crabtree and Commissioner Hamm to receive the protections of qualified immunity, "the public official[s] [must] first show[] that [they] [were] acting within the scope of [their] discretionary authority." *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013).  If the public official makes this showing, the burden then falls on Miles "to show that qualified immunity is not appropriate" in this case. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  "[T]o deny qualified immunity at the motion to dismiss stage, [the Court] must conclude both that the allegations in the complaint . . . establish a constitutional violation *and* that the constitutional violation was clearly established." *Ingram v. Kubik*, 30 F.4th 1241, 1251 (11th Cir. 2022) (third alteration in original) (emphasis in original) (quoting *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019)). In his response to the motion to dismiss, Miles "concedes that the Defendants were acting within the scope of their discretionary authority when they fired him." (Doc. 30 at 11 n.7). The Court agrees and turns to the remainder of the analysis.

Where, as here, the qualified immunity defense is asserted in the First Amendment context, "[i]t is particularly difficult to overcome." *Gaines v. Wardynski*, 871 F.3d 1203, 1210 (11th Cir. 2017) (citing other cases).  The Defendants raise the qualified immunity

defense to both Counts I and II, which are brought against Warden Crabtree (Count I) and Commissioner Hamm (Counts I and II) in their individual capacities.  In both Counts, Miles seeks compensatory and punitive damages from the two officials.  For the reasons stated below, the Court finds that Warden Crabtree and Commissioner Hamm are protected by qualified immunity, and Counts I and II against Warden Crabtree and Commissioner Hamm are due to be dismissed.

### 1.    First Amendment Retaliation

Reading the complaint's allegations in the light most favorable to him, Miles pleads a viable First Amendment retaliation claim.  As courts have consistently recognized, "[a] citizen does not surrender [his] First Amendment rights by accepting a position as a public employee." *Green v. Finkelstein*, 73 F.4th 1258, 1263 (11th Cir. 2023).  "[B]ut a public employee's right to speak as a private citizen is not absolute." *Id.*  Whether the First Amendment protects a public employee's speech necessitates "a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Lane v. Franks*, 573 U.S. 228, 231 (2014) (alteration in original) (quoting *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968)).

For a public employee "to prevail on a First Amendment claim of unlawful retaliation, [he] must make three showings." *Green*, 73 F.4th at 1263 (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565–66 (11th Cir. 1989)).  The employee must show that: (1) "the speech was made as a citizen on a matter of public concern"; (2) "the employee's

free speech interest . . . outweigh[s] the employer's interest in effective and efficient fulfillment of its responsibilities"; and (3) "the speech . . . played a substantial part in the adverse employment action." *Id.* (citing *Bryson*, 888 F.2d at 1565–66). "The first two inquiries are questions of law for the court." *Id.* (citing *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617–18 (11th Cir. 2015)). The third is a question of fact left for the jury unless "the evidence is undisputed." *Moss*, 782 F.3d at 618 (citation omitted).

### a.    Speech as a citizen on a matter of public concern

To receive the protections of the First Amendment, Miles must show that he spoke as a citizen (not a public employee) on a matter of public concern. *See Green*, 73 F.4th at 1263. First, the Court analyzes whether Miles spoke as a citizen. Then, it addresses whether Miles' speech was on a matter of public concern.

### i.    Whether speech by the public employee was as a citizen or as an employee

For the reasons explained below, Miles has plausibly pled that he spoke to WAAY TV in his capacity as a private citizen. Thus, he passes the first hurdle of the First Amendment retaliation test.

Whether a public employee's speech was as a citizen rather than a public employee requires an examination of "the content, form, and context of a given statement." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). "[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question . . . is whether the speech at issue is itself ordinarily within the scope of the employee's duties, not merely

12

whether it concerns those duties." *Lane*, 573 U.S. at 240. "[S]peech made pursuant to an employee's job duties" is "speech that owes its existence to a public employee's professional responsibilities" and is "a product that 'the employer itself has commissioned or created.'" *Abdur-Rahman v. Walker*, 567 F.3d 1278, 1283 (11th Cir. 2009) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006)).

The Supreme Court has noted that this is a "practical" inquiry. *See Garcetti*, 547 U.S. at 424. The Eleventh Circuit has identified several non-dispositive factors to consider when deciding whether speech occurs "pursuant to [an official's] duties: (1) speaking with the objective of advancing official duties; (2) harnessing workplace resources; (3) projecting official authority; (4) heeding official directives; and (5) observing workplace hierarchies." *Fernandez v. Sch. Bd. of Miami-Dade Cnty.*, 898 F.3d 1324, 1332 (11th Cir. 2018). "Formal job descriptions do not control the inquiry because they may 'bear little resemblance to the duties an employee actually is expected to perform,' and employers may craft broad descriptions to restrict the rights of employees under the First Amendment." *Abdur-Rahman*, 567 F.3d at 1283 (quoting *Garcetti*, 547 U.S. at 424–25).

Two cases from the Eleventh Circuit illustrate the practicality of this inquiry. In *Green v. Finkelstein*, the Eleventh Circuit held that the plaintiff, an assistant public defender, spoke in her personal capacity when she appeared on a podcast and criticized the public defender for various leadership deficiencies. 73 F.4th at 1264. The court reasoned that the assistant public defender spoke in her personal capacity because she appeared on a public platform "as a candidate for public office, and not as a representative of the public defender's office or a lawyer representing a client." *Id.* But different facts led the Eleventh

Circuit to a different result in *Moss v. City of Pembroke Pines*. 782 F.3d 613.  In *Moss*, the plaintiff was an Assistant Fire Chief. *Id.* at 616.  As part of his employment, he was responsible for supervising day-to-day operations, acting as a liaison between the Fire Chief and the rest of the department, serving on the pension board, and sitting on "a committee designed to foster cooperation between labor and management." *Id.* at 619. After the plaintiff made several comments to his Fire Chief and others critical of the city's budget cuts, his position was terminated. *Id.* at 616–17.  The Eleventh Circuit held that these comments occurred in the plaintiff's capacity as a public employee because they were "made in furtherance of his self-described responsibilities as the [c]ity's Assistant Fire Chief, and not as a private citizen." *Id.* at 619 (citation omitted).

The circumstances of Miles' speech bear a closer resemblance to the plaintiff in *Green* than *Moss*.  Viewing Miles' statements through the lens of the non-dispositive factors enumerated by the Eleventh Circuit shows that Miles' speech occurred as a private citizen and not as a public employee.  Like the plaintiff in *Green*, Miles was not speaking with the objective of advancing the official duties of his public employment or as a representative of his employer.  While not dispositive, the complaint, which is taken as true at this stage, alleges that Miles' job duties included "completing reports; counseling subordinate employees; demonstrating work methods and procedures; evaluating performance; exchanging information; inspecting areas of responsibility; monitoring the count of inmates; reviewing all reports; supervising subordinates; and counseling inmates."

(Doc. 25 at 16, para. 72).[9]  "[C]ommunicating with the public or the media about the Department's operations" was not part of his role as a Lieutenant at Limestone. (*Id.* para. 73).  Accepting the scope of Miles' job duties as alleged, the Court finds Miles did not speak pursuant to his responsibilities as a public employee.  The Defendants argue that Miles' statements relate to his job duties as a Lieutenant at Limestone and were therefore made pursuant to his employment. (Doc. 33 at 4).  But this argument neglects the Supreme Court's precedent in *Lane* that notes "information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240.

The four remaining factors mentioned by the Eleventh Circuit bolster the Court's conclusion.  The Court finds that the complaint sufficiently alleges that Miles spoke while off-duty to the reporter, did not project official authority, was not speaking pursuant to official directives, and did not observe workplace hierarchies.  Taken together, with all inferences read in his favor, these factors show that Miles sufficiently pled that he made statements as a private citizen to WAAY TV.

### ii.    Whether the speech was on a matter of public concern

Since Miles sufficiently pled that he spoke in his capacity as a private citizen, the Court turns to whether Miles' speech was on a matter of public concern.  If it was, Miles is eligible for First Amendment protection.  Speech is on a matter of public concern "when

---

[9] The Court notes that relying, in part, on Miles' description of his job duties at this stage in the litigation complies with the Eleventh Circuit's concern of *employers* using "broad [job] description[s]" to limit employee speech. *Abdur-Rahman*, 567 F.3d at 1283 (citing *Garcetti*, 547 U.S. at 424–25).

it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest.'" *Green*, 73 F.4th at 1263 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). The Court looks to "the content, form, and context of a given statement" to determine whether it was on a matter of public concern. *Id.* (citing *Connick*, 461 U.S. at 147–48).

Accepting the complaint's allegations as true and drawing all reasonable inferences in Miles' favor, the Court finds that his speech was on a matter of public concern. While the Defendants argue that Miles' statements generally referenced internal staffing grievances, the totality of the content, form, and context of Miles' statements show he spoke on a matter of public concern. Granted, the content of the interview included staffing problems—akin to an internal grievance. But it also communicated concerns to the public. The complaint does not identify what statements Miles made, but in reading the entirety of the complaint and attachments thereto in the light most favorable to Miles, the statements were "of legitimate news interest." *Green*, 73 F.4th at 1263 (citation omitted). In fact, the story aired on WAAY TV multiple times and was memorialized as an article on its website the next day. To at least one station, Miles' comments generated interest. Upon a view of the totality of the circumstances, the *content* of the statements (staffing concerns at Limestone) in the *form* of an interview with local media in the *context* of an ongoing discussion surrounding Alabama prisons shows that Miles' speech was on a matter of public concern that was a subject of legitimate news interest. A conclusion to the contrary would simply ignore the allegations presently before the Court. Because Miles spoke as a

private citizen on a matter of public concern, his speech is eligible for First Amendment protection.

### b.    Balancing of Miles' interest against the State's

The Court's conclusion that Miles' statements "are eligible for First Amendment protection says nothing about the government's countervailing interest in terminating [him]." *Green*, 73 F.4th at 1267.  But the Defendants fail to articulate the counterbalancing interests for the State in their motion to dismiss, resting on the argument that Miles fails to show he spoke as a private citizen on a matter of public concern.[10] (*See* doc. 28 at 12). Thus, at this stage, they abandon the argument that the State's interest in an efficient workplace outweighs Miles' individual free-speech interests. *See Ala. Aircraft Indus., Inc. v. Boeing Co.*, 2022 WL 433457, at *8 n.13 (11th Cir. Feb. 14, 2022 ) ("[The defendant] did not raise this argument in its motion to dismiss and has forfeited the argument." (citing *Reider v. Phillip Morris, USA, Inc.*, 793 F.3d 1254, 1258 (11th Cir. 2015)); *see also Carollo v. Boria*, 833 F.3d 1322, 1334 (11th Cir. 2016) ("Our decisions applying *Pickering*'s balancing test are irrelevant, however, because here [the defendants] do not advance an argument that they had an adequate justification for terminating [the plaintiff], only that [the plaintiff] spoke pursuant to his official job responsibilities.").  At this stage of the litigation, with all facts read in the light most favorable to Miles and without opposition from the Defendants, his pleading and response to the motion to dismiss provide sufficient

---

[10] The Court notes that the Defendants do argue that Miles' speech concerned internal staffing issues that are not of public concern.  These arguments could apply to the State's interest in restricting Miles' speech, but the Defendants do not advance the argument for this purpose.

reasons to suggest Miles' free-speech interest outweighed the State's interest in restricting his speech.

### c.    Substantial Part in Miles' Termination

Whether Miles' speech was a substantial part of Miles' termination is a question of fact that is more appropriately decided at a later stage in the litigation. *See Moss*, 782 F.3d at 618 ("Because [the third prong of the test], which address[es] the causal link between Plaintiff's speech and his termination, [is a] question[] of fact, a jury resolves them unless the evidence is undisputed."). Here, Miles alleges sufficient facts to support the inference that his speech played a substantial role in his termination. The Defendants do not make any arguments to the contrary. Miles, therefore, carries his burden to establish a violation of his First Amendment rights at this stage of the litigation.

### 2.    Clearly Established

Even though Miles adequately pleads a First Amendment retaliation claim, he still must show that the law was clearly established in 2022 that Warden Crabtree's and Commissioner Hamm's respective conduct violated Miles' constitutional rights. "This inquiry is 'undertaken in light of the specific context of the case, not as a broad general proposition.'" *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012) (citation omitted). "[The Eleventh Circuit] has stated many times that 'if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant[s].'" *Gaines*, 871 F.3d at 1210 (citation omitted).

The question here is "more narrow" than the question of whether the Defendants violated Miles' First Amendment rights: instead, the question is whether "it [was] clearly

established in [2022] . . . that it would violate the right to freedom of [speech] to take an adverse action against" a prison official who publicly criticized ADOC using information about the staffing of a prison. *Gaines*, 871 F.3d at 1213. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"When we consider whether the law clearly established the relevant conduct as a constitutional violation at the time that [the government official] engaged in the challenged acts, we look for 'fair warning' to officers that the conduct at issue violated a constitutional right." *Gaines*, 871 F.3d at 1208 (alteration and quotations in original) (citation omitted). A plaintiff can show a government official had fair warning in three ways:

> *First*, the plaintiffs may show that a materially similar case has already been decided. *Second*, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. *Finally*, the conduct involved in the case may so obviously violate the [C]onstitution that prior case law is unnecessary. Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant State Supreme Court].

*Gaines*, 871 F.3d at 1208 (second alteration in original) (emphases in original) (quoting *Terrell*, 668 F.3d at 1255–56). "The second and third methods are generally known as 'obvious clarity' cases," *id.* (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1350–51 (11th Cir. 2002)), and are "exceptional cases [that] rarely arise." *Santamorena v. Ga. Military Coll.*,

19

147 F.3d 1337, 1340 n.6 (11th Cir. 1998). But they can arise "where the words of the federal statute or constitutional provision at issue are 'so clear and the conduct so bad that the case law is not needed to establish that the conduct cannot be lawful,' or where the case law that does exist is so clear and broad (and 'not tied to particularized facts') that 'every objectively reasonable government official facing the circumstances would know that the official's conduct [violated] federal law when the official acted.'" *Gaines*, 871 F.3d at 1209 (citation omitted).

In the First Amendment context, a plaintiff can overcome a qualified immunity defense if the balance between the plaintiff's free-speech interests and the State's interest in limiting the speech "tilt[s] conclusively in favor of [the plaintiff] such that the defendants had fair and clear warning that their actions were unconstitutional." *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1320 (11th Cir. 2005). Upon a careful examination of the relevant law, the Court finds that Miles cannot make such a showing to overcome the Defendants' qualified immunity defense. Specifically, in First Amendment cases involving "paramilitary organizations" like police and fire departments, the Eleventh Circuit has long acknowledged the need for comity among officers for the effective operation of these offices. *See, e.g., Anderson v. Burke Cnty.*, 239 F.3d 1216, 1222 (11th Cir. 2001); *Stanley v. City of Dalton*, 219 F.3d 1280, 1289–90 (11th Cir. 2000); *Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir. 1991). In these contexts, the Eleventh Circuit has recognized a "strong interest in maintaining [the] discipline and loyalty of its officers." *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1294 (11th Cir. 2000). Within a "paramilitary" organization, "comments concerning co-workers' performance of their

duties and superior officers' integrity can 'directly interfere[ ] with the confidentiality, esprit de corps and efficient operation of the [law-enforcement] department.'" *Busby*, 931 F.2d at 774 (first alteration in original) (citation omitted); *see also Thorne v. City of El Segundo*, 726 F.2d 459, 470 n.10 (9th Cir. 1983) (noting that courts have recognized "that the state's interest in regulating the conduct of its employees is perhaps at its greatest where paramilitary organizations, such as a police force, are involved" (citation omitted)).

The Court finds that the same reasoning applies with equal force in the correctional context where "order, loyalty, morale and harmony are at a premium" to ensure the effective administration of a prison. *Rogers v. Miller*, 57 F.3d 986, 991 (11th Cir. 1995) (citing *Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994)).  These special concerns in the "paramilitary context" are relevant to the Court's consideration of whether the Defendants violated Miles' clearly established First Amendment rights.  After all, qualified immunity serves to protect public officials from individual liability when the questions of law are less than clear. *See, e.g., Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.").

As the Defendants note in their brief in support of the motion to dismiss, Miles fails to identify "any case law that is materially similar to this present case so that it has put the current question beyond debate." (Doc. 28 at 18).  In response, Miles claims that the broad principles protecting his ability to speak as a private citizen on a matter of public concern (relating to the safety of the public) with information obtained from his government employment were clearly established in 2022 when he was terminated. (*See* doc. 30 at 16–

17 n.12 (citing *Lane*, 573 U.S. at 239–40; *Cook*, 414 F.3d at 1319)).  While Miles may rely on broad principles to establish a constitutional violation, the Court finds that Miles has not shown that every reasonable official in the Defendants' position would have known that their conduct violated the First Amendment when they fired Miles in 2022, such that Miles can overcome the qualified immunity defense.

In reaching its conclusion that Miles' statements were protected by the First Amendment, "[t]he [C]ourt weighed several factors, as the law instructs, applied them to the facts of this case, and ultimately concluded that [Miles] [spoke] as a citizen on a matter of public concern.  But a reasonable government official might weigh the factors differently and reach the opposite conclusion." *Hartwell v. City of Montgomery*, 487 F. Supp. 2d 1313, 1331 (M.D. Ala. 2007).  Because a reasonable government official could reach a different conclusion, Miles' First Amendment rights were not clearly established.  Thus, Warden Crabtree and Commissioner Hamm are protected by qualified immunity, and Counts I and II against the Defendants in their individual capacities are due to be dismissed.

## C.    Eleventh Amendment Immunity

Count III of Miles' complaint, however, is against Commissioner Hamm in his official capacity.  Suits against a state official in his official capacity are generally barred by the Eleventh Amendment "when the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (citation omitted). *Ex parte Young*,[11] however, provides a limited exception to this prohibition and allows for

---

[11] 209 U.S. 123 (1908).

a plaintiff to seek "*prospective* equitable relief" against a state official "to end *continuing* violations of federal law." *Lane v. Cent. Ala. Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014) (per curiam) (emphases in original) (quoting *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999)).  Miles' claim fits within the exception created by *Ex Parte Young*.

The Court finds that, at this stage of the litigation, with all facts read in his favor, Miles has plausibly pled that his First Amendment rights were violated when he was terminated after speaking to WAAY TV, for the reasons explained above in Section B.1. And unlike suits against officials in their individual capacities, suits against officials in their official capacities are not subject to the same "clearly established" requirement. *See Lane*, 772 F.3d at 1350–51 (allowing claims against official in official capacity to proceed when qualified immunity applied to claims against official in individual capacity).  Miles' claim, therefore, did not have to be clearly established in 2022 for this claim to proceed. Miles' recovery, however, is limited.  For this claim, Miles may receive "*prospective* equitable relief to end *continuing* violations of federal law," *Lane*, 772 F.3d at 1351 (emphases in original) (citation omitted), and limited declaratory relief such that "[i]t does not impose *upon the State* 'a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials,'" *see Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002) (emphasis in original) (citation omitted).

As the Eleventh Circuit observed in *Lane*, "nothing demonstrates . . . that [Miles'] requested reinstatement is considerably different [than other forms of equitable relief], implicating Alabama's sovereignty interests and funds so significantly that the *Ex parte*

23

*Young* exception would be inapplicable." *See Lane*, 772 F.3d at 1351.  Alabama having "to pay [Miles'] salary does not trigger Eleventh Amendment protection" as "[t]he Supreme Court has recognized that compliance with the terms of prospective injunctive relief will often necessitate the expenditure of state funds." *Id.* (citing *Edelman v. Jordan*, 415 U.S. 651 (1974)).  "Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young*." *Edelman*, 415 U.S. at 668.  With these limitations on the relief that Miles may receive, Count III against Commissioner Hamm in his official capacity survives the motion to dismiss.

## VI.  CONCLUSION

Based upon the foregoing, it is ORDERED that the Defendants' motion to dismiss (doc. 27) is GRANTED in part and DENIED in part as follows:

1.      Count I against Defendants John Q. Hamm and Chadwick Crabtree in their individual capacities is DISMISSED with prejudice;

2.      Count II against Defendant John Q. Hamm in his individual capacity is DISMISSED with prejudice;

3.      Defendant Chadwick Crabtree is DISMISSED from the case;

4.      Count III against Defendant John Q. Hamm in his official capacity remains pending.

DONE this 24th day of March, 2025.

_____/s/ Emily C. Marks_____

EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE